FILED by ___JA___ D.C.

Mar 16, 2021

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. __21-20159-CR-MARTINEZ/BECERRA__

18 U.S.C. § 371
18 U.S.C. § 981(a)(1)(C)

UNITED STATES OF AMERICA

vs.

EDUARDO NAVARRO and
NAYADE VARONA,

   Defendants.

_____/

## INFORMATION

The United States Attorney charges that:

## GENERAL ALLEGATIONS

At all times relevant to this Information:

### *The Federal Food, Drug, and Cosmetic Act*

1. The United States Food and Drug Administration ("FDA") was the agency of the United States charged with responsibility for protecting the health and safety of the American public by enforcing the Federal Food, Drug, and Cosmetic Act ("FDCA"). Among other purposes, the FDCA was designed to ensure that drugs sold for human use were safe and effective, and that clinical trials undertaken to test experimental drugs were conducted honestly and safely.

2. A "clinical trial" was an investigation involving one or more human subjects intended to determine the safety or effectiveness of an experimental drug. 21 C.F.R. § 312.3(b).

3. A "sponsor" was a pharmaceutical company, government agency, or other organization that initiated and took responsibility for a clinical trial but did not typically conduct the clinical trial. 21 C.F.R. § 312.3(b).

4. A "contract research organization" was an organization retained by a sponsor to manage various aspects of a clinical trial, including recruitment of clinical investigators and study sites for a clinical trial. 21 C.F.R. § 312.3(b).

5. Sponsors typically initiated clinical trials for purposes of submitting the resultant data to the FDA. Among other things, sponsors submitted such data to the FDA in support of applications seeking FDA approval to market new drugs within the United States. The FDA relied on the veracity of clinical trial data to make significant decisions concerning the safety and efficacy of new drugs, with the ultimate goal of ensuring that all FDA-approved drugs were safe and effective for their approved indications.

6. Prior to beginning a clinical trial, a sponsor was required to provide the FDA with extensive information regarding the proposed study, including a detailed investigational plan known as a "protocol." 21 C.F.R. § 312.23(a)(6). The protocol described, among other things, the criteria for individuals to participate in the study as subjects (known as eligibility criteria), schedules of tests and procedures, drug and dosage regimens, the length of the study, and the outcomes that would be measured by the study. 21 C.F.R. § 312.23(a)(6). Clinical trials were required to be conducted according to the protocol. 21 C.F.R. § 312.53(c)(1)(vi)(a).

7. A "clinical investigator" was an investigator, typically a physician, with responsibility for actually conducting a clinical trial and under whose immediate direction an experimental drug was to be administered or dispensed to a subject. 21 C.F.R. § 312.3(b). A clinical investigator was responsible for ensuring that clinical trials were conducted according to

the protocol and applicable FDA regulations. 21 C.F.R. §§ 312.53(c)(1)(vi)(a) & (b). Before beginning a clinical trial, a clinical investigator was required to provide the sponsor with a signed Form FDA 1572, in which the clinical investigator agreed to abide by the terms of the protocol and all applicable FDA regulations. 21 C.F.R. § 312.53(c)(1). A "subinvestigator" worked under the direction of the clinical investigator and assisted the clinical investigator in the conduct of the clinical trial. 21 C.F.R. § 312.3(b); 21 C.F.R. § 312.53(c)(1)(viii).

8.      FDA regulations imposed a number of requirements on clinical investigators, including the obligation to prepare and maintain adequate and accurate "case histories" that recorded all observations and other data pertinent to the investigation on each subject administered an experimental drug. The case histories were required to include, among other things, informed consent forms and medical records. 21 C.F.R. § 312.62(b).

9.      FDA regulations also required clinical investigators to maintain adequate records concerning the disposition of study drugs, including dates and quantities of drugs dispensed to subjects. 21 C.F.R. § 312.62(a).

### *The Defendants and their Co-Conspirators*

10.     Tellus Clinical Research ("Tellus") was a medical clinic located at 9425 Sunset Drive, Suite 136, Miami, Florida, that conducted clinical trials on behalf of pharmaceutical company sponsors.

11.     Defendant **EDUARDO NAVARRO** was a resident of Miami, Florida and licensed to practice as an advanced registered nurse practitioner in the State of Florida. From in or around April 2014 and continuing through in or around April 2016, **NAVARRO** was employed at Tellus as a subinvestigator.

12. Defendant **NAYADE VARONA** was a resident of Miami, Florida. From or about June 2014, and continuing through in or around July 2016, **VARONA** was employed at Tellus as an assistant study coordinator.

13. Martin Valdes was a medical doctor residing in Coral Gables, Florida, who was licensed to practice medicine in the State of Florida and served as a clinical investigator for clinical trials conducted at Tellus.

14. Analay Rico was Tellus employee, residing in Miami, Florida, who served as the lead study coordinator for clinical trials conducted at Tellus.

15. Daylen Diaz was a Tellus employee, residing in Miami, Florida, who served as a research assistant and assistant study coordinator for clinical trials conducted at Tellus.

16. Co-Conspirator 1 (CC#1) was a Tellus employee, residing in Miami, Florida, who served as an assistant study coordinator for clinical trials conducted at Tellus.

### *The Sponsors and Their Clinical Trials*

17. Sponsor #1 and Sponsor #2 were drug manufacturers that developed, investigated, and manufactured drugs for commercial distribution in the United States. Part of their business was investigating new drugs through clinical trials regulated by the FDA.

18. Sponsor #1 initiated two clinical trials concerning a new investigational drug intended to treat patients suffering from irritable bowel syndrome with diarrhea (collectively, "the IBS trials"). Contract Research Organization #1 ("CRO #1") was a contract research organization that hired clinical investigators and managed clinical trials for sponsors. Sponsor #1 retained CRO #1 to manage various aspects of the IBS trials. Among other things, CRO #1 was responsible for hiring clinical investigators and study sites to conduct the IBS trials.

19. On or about September 5, 2014, CRO #1 entered into a contract with Tellus and Martin Valdes in which Tellus and Valdes agreed to serve as study site and clinical investigator, respectively, for the second IBS trial. The contract required Tellus and Valdes to conduct the trial in strict compliance with the protocol and all applicable laws and regulations.

20. Among other things, the study protocols for the IBS trials required subjects to make periodic scheduled visits to the clinical trial site. The study protocols further required that, during some of these visits, subjects would provide blood samples for pharmacokinetic analysis, receive physical exams by clinical trial staff, and undergo electrocardiograms.

21. As part of the IBS trials, Tellus was required to pay each subject $100 for travel and parking costs for each visit to the Tellus site.

22. The study protocols for the IBS trials also required subjects to use an "e-diary" system to report their daily experience with the experimental drugs being studied. Specifically, subjects were required to make daily phone calls to a toll-free number maintained by a third party. Upon calling, subjects would be prompted with automated questions concerning their daily drug experience, and directed to answer those questions non-verbally by pushing touch-tone buttons on their phones. The study protocols required that the subjects themselves, not clinical investigators or site staff, respond to questions using the e-diary system.

23. Sponsor #2 initiated a clinical trial concerning a new investigational drug intended to treat patients suffering from diabetic nephropathy, a kidney disease ("the diabetes trial").

24. On or about December 29, 2014, Sponsor #2 entered into a contract with Tellus and Martin Valdes in which Tellus and Valdes agreed to serve as study site and clinical investigator, respectively, for the diabetes trial. The contract required Tellus and Valdes to conduct the diabetes trial in strict compliance with the protocol and all applicable laws and regulations.

25. Among other things, the study protocol for the diabetes trial required subjects to make periodic scheduled visits to the clinical trial site. The study protocol further required subjects to, among other things, provide urine and blood for analysis and receive physical exams by clinical trial staff.

26. CRO #1 and Sponsor #2 paid Tellus for its work on the IBS trials and the diabetes trial, respectively. Pursuant to the contracts governing the IBS trials and the diabetes trial, payment was to be based largely on the number of subjects enrolled in the clinical trial and the duration of time that the subjects remained in the clinical trial. Thus, the more subjects that were enrolled in the studies at any given clinical trial site, the higher the potential income for that study site, its clinical investigators, and its staff.

## **CONSPIRACY**
## **(18 U.S.C. § 371)**

Beginning in or around June 2014, and continuing at least through in or around July 2016, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendants,

**EDUARDO NAVARRO and**
**NAYADE VARONA,**

did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate, and agree with each other, with Martin Valdes, Analay Rico, Daylen Diaz, CC#1, and others known and unknown to the United States Attorney:

 a. to defraud the United States and departments and agencies thereof, namely, the FDA, by impairing, impeding, and obstructing by craft, trickery, deceit, and dishonest means, the

FDA's lawful and legitimate function of regulating clinical trials of drugs; and

b. to commit an offense against the United States by knowingly and with intent to defraud, devise and intend to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that the pretenses, representations, and promises were false and fraudulent when made, and for the purpose of executing the scheme, transmitting and causing to be transmitted, by means of wire communications in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds, in violation of Title 18, United States Code, Section 1343.

## PURPOSE OF THE CONSPIRACY

27. It was the purpose of the conspiracy for the defendants and their co-conspirators to unlawfully enrich themselves by making materially false and fraudulent representations about Tellus's clinical trials, fabricating data and the participation of subjects in those clinical trials, concealing from the FDA, sponsors, and contract research organizations the fact that the data and participation of subjects had been fabricated, inducing sponsors and contract research organizations to pay money to Tellus and its clinical investigators, and keeping the moneys paid for their own benefit.

## MANNER AND MEANS OF THE CONSPIRACY

The manner and means by which the defendants and their co-conspirators sought to accomplish the objects and purpose of the conspiracy included, among others, the following:

28. Martin Valdes, Analay Rico, and other co-conspirators sought out opportunities for Tellus and its clinical investigators to conduct clinical trials on behalf of sponsors.

29. Tellus and Martin Valdes entered into contracts with sponsors, and with contract research organizations acting on behalf of sponsors, in which Tellus and Valdes agreed to conduct

7

clinical trials at the Tellus site. In return, the sponsors and contract research organizations agreed to pay Tellus and Valdes for their services.

30.     Rather than recruit subjects who met all eligibility criteria, and administer the study procedures as required by the protocols, **EDUARDO NAVARRO**, **NAYADE VARONA**, Martin Valdes, Analay Rico, Daylen Diaz, CC#1, and other co-conspirators falsified and fabricated the participation of subjects in the clinical trials.

31.     **EDUARDO NAVARRO**, **NAYADE VARONA** and their co-conspirators knew that the FDA regulated clinical trials, and knew that clinical investigators were required to maintain case histories documenting the participation of subjects in the clinical trials. **NAVARRO**, **VARONA**, and their co-conspirators also knew that the FDA, and in some cases contract research organizations acting on behalf of sponsors, had the authority to inspect the Tellus site and review the case histories.

32.     In order to prevent the FDA and contract research organizations from learning that the co-conspirators had falsified and fabricated the participation of subjects in the clinical trials, **EDUARDO NAVARRO**, **NAYADE VARONA**, Martin Valdes, Analay Rico, Daylen Diaz, CC#1, and other co-conspirators fabricated written case histories, so that the case histories falsely represented that certain persons were subjects in clinical trials, when, in truth and in fact, those persons were not subjects in clinical trials.

33.     One or more of the co-conspirators employed a variety of means to obtain personal identification information, including copies of identification documents such as drivers' licenses and passports, for purported clinical trial subjects.

34.     In some instances, one or more of the co-conspirators obtained identification information from persons they knew, including friends and family members, and used the

identification information to falsely portray the persons as clinical trial subjects.

35. In other instances, one or more of the co-conspirators obtained identification information from various third parties, and used that identification information to falsely portray the persons as clinical trial subjects.

36. In one instance, Daylen Diaz obtained the identification information of K.L., a resident of Miami, Florida, by taking the information from an employment file maintained by a company at which Diaz and K.L. were both employed. Diaz took K.L.'s identification information from the employment file, without the knowledge or consent of K.L. or the employer, for the specific purpose of falsely portraying K.L. as a subject in the second IBS trial.

37. **EDUARDO NAVARRO**, **NAYADE VARONA**, Martin Valdes, Analay Rico, Daylen Diaz, CC#1, and other co-conspirators falsified the content of case histories to make it appear that the purported subjects had, among other things, consented to participating in clinical trials, satisfied the study protocol eligibility criteria, appeared for scheduled visits at the site, saw the investigator or subinvestigator for physical examinations, took the study drugs as required, and received checks as payment for site visits.

38. In order to conceal the fact that the subjects were not actually participating in the clinical trials, one or more of the co-conspirators discarded, without using, the study drugs provided by sponsors, and **NAYADE VARONA**, Analay Rico, and Daylen Diaz placed false documentation in the case histories representing that subjects were taking study drugs as required by the protocols.

39. In order to conceal the fact that the subjects were not actually participating in the clinical trials, **NAYADE VARONA**, Analay Rico, Daylen Diaz, and other co-conspirators drew blood from Tellus employees, sent the blood to third party labs for analysis, and received the blood

test results back from the labs. **VARONA**, Rico, Diaz, and other co-conspirators placed documentation in the case histories falsely representing that the blood test results were those of clinical trial subjects.

40. In order to conceal the fact that the subjects were not actually participating in clinical trials, Analay Rico, Daylen Diaz, and other co-conspirators placed telephone calls, on behalf of purported subjects, to the e-diary system for the IBS trials and provided false and fictitious answers in response to questions about the subjects' daily drug experience.

41. In order to conceal the fact that the subjects were not actually participating in the clinical trials, one or more of the co-conspirators placed photocopies of checks, made out from the Tellus to the study subjects, in the case histories. **NAYADE VARONA**, Analay Rico, Daylen Diaz, and other co-conspirators signed payment logs in the case histories to falsely indicate that the subjects had received the checks on certain specific dates.

42. In some cases, **NAYADE VARONA**, Analay Rico, Daylen Diaz, and other co-conspirators deposited the checks, made out from Tellus to the purported study subjects, into the co-conspirators' own personal bank accounts.

## OVERT ACTS

In furtherance of the conspiracy, and to accomplish the objects and purpose thereof, at least one of the following overt acts, among others, were committed in the Southern District of Florida, and elsewhere, by at least one co-conspirator:

1. On August 13, 2014, Martin Valdes signed his name to a Form FDA 1572, agreeing to conduct the second IBS trial in accordance with the study protocol and to maintain adequate and accurate records, among other things.

2. On or about September 3, 2014, Martin Valdes signed his name to a contract with

CRO #1, whereby Valdes agreed to serve as the clinical investigator for the second IBS trial at the Tellus site.

3. On or about February 16, 2015, Analay Rico initialed case history documentation for the second IBS trial, falsely portraying K.L. as having participated in a screening visit for the second IBS trial at Tellus site, when in fact, as Rico well knew, K.L. had not participated in such a screening visit and this representation was false.

4. On or about February 16, 2015, Analay Rico signed informed consent documentation falsely representing that K.L. had given informed consent to participate as a subject in the second IBS trial, when in fact, as Rico well knew, K.L. had not given informed consent and this representation was false.

5. On or about February 16, 2015, **EDUARDO NAVARRO** signed case history documentation for the second IBS trial, falsely and fraudulently representing that he had seen K.L. in person and performed a physical examination on K.L. as required by the study protocol, including, among other things, examining K.L.'s general appearance, respiratory system, and cardiovascular system, when in fact, as **NAVARRO** well knew, K.L. was not a participant in the second IBS trial and these representations were false.

6. On or about February 16, 2015, **EDUARDO NAVARRO** wrote and signed a statement that "[p]hysical examination was done" in case history documentation for the second IBS trial, falsely representing that he had seen K.L. in person and performed a physical examination on K.L as required by the study protocol, when in fact, as **NAVARRO** well knew, K.L. was not a participant in the second IBS trial and these representation were false.

7. On or about March 9, 2015, Daylen Diaz initialed case history documentation for the second IBS trial, falsely representing that Diaz had seen K.L. in person and taken a number of

11

actions required by the study protocol including, among other things, talking to K.L. about her dietary habits, lifestyle, and exercise regimen, collecting K.L.'s urine, taking K.L.'s vital signs, and taking K.L.'s blood, when in fact, as Diaz well knew, K.L. was not a participant in the second IBS trial and these representations were false.

8. On or about April 6, 2015, Daylen Diaz signed a Study Payment Log for the second IBS trial, falsely representing that check #2677, made out from Tellus to K.L. in the amount of $100, had been disbursed to and received by K.L. on or about April 6, 2015, when in fact, as Diaz well knew, K.L. was not a participant in the second IBS trial and this representation was false.

9. On or about April 6, 2015, Analay Rico deposited check #2677, made out from Tellus to K.L. in the amount of $100, into Rico's personal bank account.

10. On or about June 1, 2015, **NAYADE VARONA** initialed case history documentation for the second IBS trial, falsely and fraudulently representing that she had seen K.L. in person and taken a number of actions required by the study protocol including, among other things, talking to K.L. about her dietary habits, lifestyle, and exercise regimen, collecting K.L.'s urine, taking K.L.'s vital signs, and dispensing the study drug to K.L., when in fact, as **VARONA** well knew, K.L. was not a participant in the second IBS trial and these representations were false.

11. On or about June 1, 2015, **NAYADE VARONA** noted and initialed case history documentation for the second IBS trial, falsely representing that she had collected K.L.'s urine at 6:55, had performed a urine pregnancy test at 6:58, and read the test results at 7:02, when in fact, as **VARONA** well knew, K.L. was not a participant in the second IBS trial and these representations were false.

12. On or about June 1, 2015, **NAYADE VARONA** noted and initialed case history

documentation for the second IBS trial, falsely representing that she had taken K.L.'s vital signs at 7:05, when in fact, as **VARONA** well knew, K.L. was not a participant in the second IBS trial and this representation was false.

13. On or about June 1, 2015, Martin Valdes signed case history documentation for the second IBS trial, falsely representing that Valdes had seen K.L. in person and performed a physical examination on K.L. as required by the study protocol, including, among other things, examining K.L.'s general appearance, respiratory system, and cardiovascular system, when in fact, as Valdes well knew, K.L. was not a participant in the second IBS trial and these representations were false.

14. On or about March 29, 2016, CC#1 signed case history documentation for the diabetes trial, falsely representing that CC#1 had seen S.D. in person and, among other things, collected three urine specimens and blood from S.D. when, in truth and in fact, as CC#1 well knew, CC#1 had not taken these actions and these representations were false.

All in violation of Title 18, United States Code, Section 371.

## FORFEITURE
### (18 U.S.C. § 981(a)(1)(C))

1. The general allegations in this Information are re-alleged and fully incorporated herein for alleging forfeiture to the United States of certain property in which the defendants, **EDUARDO NAVARRO** and **NAYADE VARONA**, have an interest.

2. Upon conviction of a conspiracy to violate Title 18, United States Code, Section 1343, as alleged in this Information, the defendant so convicted shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), any property, real or personal, which constitutes or is derived from proceeds traceable to such violation.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), and the procedure outlined at Title 21, United States Code, Section 853, both of which are made applicable by Title 28, United States Code, Section 2461(c).

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY

GUSTAV W. EYLER
DIRECTOR
U.S. DEPARTMENT OF JUSTICE
CONSUMER PROTECTION BRANCH

By:

LAUREN M. ELFNER
JOSHUA D. ROTHMAN
TRIAL ATTORNEYS
U.S. DEPARTMENT OF JUSTICE
CONSUMER PROTECTION BRANCH

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

v.

Eduardo Navarro, et al.

_____Defendants._____/

CASE NO._____

**CERTIFICATE OF TRIAL ATTORNEY***

**Superseding Case Information:**

New defendant(s)         Yes ___  No ___
Number of new defendants      ___
Total number of counts        ___

**Court Division**: (Select One)
✓  Miami    ___ Key West
___ FTL     ___ WPB    ___ FTP

1. I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3. Interpreter:   (Yes or No)   Yes
   List language and/or dialect   Spanish

4. This case will take __0__ days for the parties to try.

5. Please check appropriate category and type of offense listed below:

   (Check only one)                    (Check only one)
   I    0 to 5 days      ✓           Petty       ___
   II   6 to 10 days     ___         Minor       ___
   III  11 to 20 days    ___         Misdem.     ___
   IV   21 to 60 days    ___         Felony      ✓
   V    61 days and over ___

6. Has this case previously been filed in this District Court?   (Yes or No)   No
   If yes: Judge _____ Case No. _____
   (Attach copy of dispositive order)
   Has a complaint been filed in this matter?   (Yes or No)   No
   If yes: Magistrate Case No. _____
   Related miscellaneous numbers:   21-CR-20106-Scola/Goodman
   Defendant(s) in federal custody as of _____
   Defendant(s) in state custody as of _____
   Rule 20 from the District of _____
   Is this a potential death penalty case? (Yes or No)   No

7. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to August 9, 2013 (Mag. Judge Alicia O. Valle)?   Yes ___   No ✓

8. Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard)?   Yes ___   No ✓

9. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to October 3, 2019 (Mag. Judge Jared Strauss)?   Yes ___   No ✓

_____
Lauren M. Elfner, DOJ Trial Attorney
Court ID No. A5502478

*Penalty Sheet(s) attached                                    REV 6/5/2020

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## PENALTY SHEET

**Defendant's Name**:  Eduardo Navarro

**Case No**: _____

Count #: 1

Conspiracy

Title 18, United States Code, Section 371

* **Max. Penalty**: Five (5) years' imprisonment

*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## PENALTY SHEET

**Defendant's Name**: Nayade Varona

**Case No**: _____

Count #: 1

Conspiracy

Title 18, United States Code, Section 371

* **Max. Penalty**: Five (5) years' imprisonment

\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.

AO 455 (Rev. 01/09) Waiver of an Indictment

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No. |
| | ) | |
| Eduardo Navarro, | ) | |
| *Defendant* | ) | |

## WAIVER OF AN INDICTMENT

I understand that I have been accused of one or more offenses punishable by imprisonment for more than one year. I was advised in open court of my rights and the nature of the proposed charges against me.

After receiving this advice, I waive my right to prosecution by indictment and consent to prosecution by information.

Date: _____

_____
*Defendant's signature*

_____
*Signature of defendant's attorney*

**LUIS FERNANDEZ, ESQ.**
*Printed name of defendant's attorney*

_____
*Judge's signature*

_____
*Judge's printed name and title*

AO 455 (Rev. 01/09) Waiver of an Indictment

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| United States of America | ) | |
|---|---|---|
| v. | ) | Case No. |
| | ) | |
| Nayade Varona, | ) | |
| *Defendant* | ) | |

**WAIVER OF AN INDICTMENT**

I understand that I have been accused of one or more offenses punishable by imprisonment for more than one year. I was advised in open court of my rights and the nature of the proposed charges against me.

After receiving this advice, I waive my right to prosecution by indictment and consent to prosecution by information.

Date: _____

_____
*Defendant's signature*

_____
*Signature of defendant's attorney*

ARNALDO J. SURI, ESQ.
*Printed name of defendant's attorney*

_____
*Judge's signature*

_____
*Judge's printed name and title*